2014-1474

**(Serial No. 10/770,767)**

# United States Court of Appeals

# for the Federal Circuit

**IN RE JOHN NICHOLAS GROSS**

*Appeal from the United States Patent and Trademark Office,*

*Board of Patent Appeals and Interferences*

# (CORRECTED) REPLY BRIEF FOR APPELLANT

J. Nicholas Gross
Law Office of J. Nicholas Gross, PC
PO Box 9489
Berkeley, CA 94709
(510) 540-6300
(510) 540-6315
Attorney for Appellants

November 17, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## IN RE JOHN NICHOLAS GROSS
## No. 2014-1474

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant <u>John N. Gross</u> certifies the following:

1. The full name of every party or amicus represented by me is:

**John N. Gross**

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

**Mediaqueue LLC**

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

**None**

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**Law Office of J. Nicholas Gross, P.C.**

<u>November 17 2014</u>

J. Nicholas Gross
Counsel for Appellant

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................1

II.    THE BOARD'S RE-WRITE OF THE WRITTEN DESCRIPTION REJECTION CANNOT BE DEFENDED.................................................................2

III.    APPELLANT ADDRESSED THE RATIONALE AS PRESENTED BY THE EXAMINER FOR THE WRITTEN DESCRIPTION REJECTION BUT WAS IGNORED BY THE BOARD.....................................................................7

IV.    THE APPELLANT'S CITED MATERIALS SUPPORT THE CLAIMED LIMITATIONS ..............................................................................9

V.    THE CITATIONS AND ARGUMENTS SUBMITTED AT PP. 25-29 OF THE APPELLANT'S OPENING BRIEF WERE NOT WAIVED ...........11

VI.    THE NEWLY PROPOSED §101 REJECTION IS PROCEDURALLY AND SUBSTANTIVELY DEFICIENT ...................................................15

    A.   The Claimed Invention Does Not Embody "An Idea of Itself" .........................15

    B.   The Claimed Invention Improves Existing Technological Processes, Thereby Removing It From The Realm of Ineligible Subject Matter .........................................18

    C.   The Claimed Invention Further Satisfies the Second Step of Alice ....................23

VII.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT.................27

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

<u>Alice Corp. Pty. Ltd. v. CLS Bank Int'l</u>, 134 S. Ct. 2347 (2014)………..15-17, 23-25

<u>Bilski v. Kappos</u>, 561 U.S. 593, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010)……...15-16

<u>Diamond v. Diehr</u>, 450 U.S. 175, 187, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981)…....18

<u>Parker v. Flook</u>, 437 U.S. 584, 594-595, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978)…....17


<u>REGULATIONS</u>

35 USC §100 …………………………………………………………………..25

35 USC §101 …………………………………………………………………passim

35 USC §112 …………………………………………………………………passim

## I.     INTRODUCTION

Appellant respectfully submits that substance of the Examiner's written description rejection on the record is abundantly clear: it is predicated on the narrow basis that he believed there was no operation by which titles were "removed" in the disclosure.  Appellant presented this narrow issue in *precisely* this form to the PTAB (A168), where it was then addressed in kind by the Examiner (A206-A210).

Appellant thereafter relied reasonably on the Examiner's detailed response in the Answer that there was no *other* basis for the rejection, and filed a Reply Brief (A221 – A224) addressing the only counter arguments on this point raised by the Examiner.  Accordingly despite efforts to justify the PTAB's re-write of the rejection into something else, the Solicitor's Brief ("SB") fails to overcome the overwhelming evidence on the record.

In addition Appellant submits that the "rejection" advanced by the Examiner, no matter how re-interpreted by the PTAB, was thoroughly addressed by Appellant with citations on the record to support the claim limitations. The PTAB then unapologetically reported that it simply ignored these sections of the Brief, demonstrating unequivocally that they did not consider the totality of the evidence bearing on the written description issue.  When these supporting citations for the relevant claim limitations - disclosed in the Appeal Brief and Reply Brief - are

considered there is simply no "substantial evidence" that can support the PTAB's decisions.

Appellant further respectfully disagrees that waiver should apply here as to the citations and arguments raised on pages 25-29 of the Appellant's Opening Brief ("AOB"). As discussed below, the majority of this discussion is presented to address the new grounds of rejection only raised by the PTAB in their two decisions. Moreover at least the supporting disclosure citations had been provided before, and if the PTAB believed it was free to re-write the rejection, it should have also considered what evidence had been presented directed to such new rejection in its determination, which it did not do.

Finally Appellant also addresses the new §101 rejection proposed by the SB. Fundamentally Appellant submits that this rejection is both improper (as Appellant was given no opportunity to address this issue below) and unsupportable on the merits for the reasons. Nonetheless Appellant has addressed the issue fully below for the benefit of this Court and the sake of judicial economy.

## II.    THE BOARD'S RE-WRITE OF THE WRITTEN DESCRIPTION REJECTION CANNOT BE DEFENDED

The Solicitor's Brief (pp. 12-13) attempts to embrace the path taken by the Board, by suggesting that the Examiner mysteriously meant something other than what he actually wrote. It quotes a portion of a single line in the Answer as support

2

that the Examiner was really objecting to the "comparison step" as opposed to the "removal" step. The fault in the Solicitor's logic is apparent when one simply looks at the <u>entirety</u> of the content presented by the Examiner. Again, here is the relevant portion from the <u>Final Office Action</u>:

> In the independent claims applicant has recited that the system compares content of a playable media item to content of media items viewed by the subscriber and automatically removes the second playable media item. Applicant has stated that paragraphs 65,66,73,75,77 and 96 support what is claimed. The examiner has reviewed these sections and do not see where it has been disclosed that an item is actually removed from the queue based on a comparison step as claimed. It seems to be disclosed that a title may bump another one as far as shipping order goes but where is there support in the specification as originally filed for the actual removal of the item.

The Solicitor's Brief quotes only from the line *before* the highlighted portion above, thus conveniently ignoring the clarification from the Examiner on what he was objecting to in this instance. Appellant understood the Examiner's clarification, and used it to frame the remaining narrow issue in their Brief to the PTAB as such:

> **The sole disagreement here with the Examiner** revolves around the adequacy of the description and **whether it discloses that titles can be automatically removed from a subscriber rental queue** (in addition to them being automatically added as necessary, which is not in dispute). In this respect **Applicant noted a number of areas of the specification that support this language**. (A168)

In other words, Appellant reiterated and posited precisely what he understood to be the main rejection of the Examiner on this point. Unremarkably therefore the

Examiner's Answer, in turn, again confirmed that Appellant indeed posited the main

rejection:

> "...**The appellant's statement of the grounds of rejection to be reviewed on appeal is correct.**" (A191)(emphasis added)

There is no qualification in this statement.  In the remainder of the Answer,

and despite ample opportunity to do so, nowhere does the Examiner ever contradict

Appellant's formulation of the issue at hand:

> "**The Examiner still takes the position** that the limitation that the **media titles can be automatically removed from a subscriber rental queue** is directed to new matter that **is not supported by the originally filed disclosure**" (A206)

> "**The Examiner does not see how** this portion of the specification somehow supports the argument that the term "bump" **necessarily requires removal of an item**." (A207)

> "**The embodiment of figure 9 is not actually removing any media titles** from any queue…..**There is no discussion of any media titles being removed from any queue** as has been argued" (A208)

> "The Examiner feels that the **term "bump" does not mean necessarily require removal**" (A207)

> "**The examiner still does not find** there to be any support in the specification as originally filed for the notion that **a media title is automatically removed from the queue**." (A209)

[A206-A209] (emphasis added)  The Board and the Solicitor cannot run away

from these plain recitations by the Examiner: he confirmed and re-confirmed the gist

of the rejection precisely in the narrow form that Appellants had presented it.  He

categorically believed (and despite the original claim language expressly saying so) <u>and declared</u> that the disclosure <u>did not show removing titles from the subscriber queue</u>.

Remarkably even the Solicitor now (SB 13) cites to the "titles exchange" discussion in Appellant's disclosure (A66) and <u>admits</u> that it shows an example of … titles being <u>removed</u> from a queue.  This statement is made without appreciating that it directly contradicts and points out the clear error in the Examiner's argument in the Answer (see above) that no embodiment showed "removing titles." (A208)

Accordingly, like the Board, the Solicitor unfortunately tries to fill in too many gaps in the Examiner's analysis with mortar that is too thin.  The record overwhelming shows there is no hidden message: he was simply confused and mistaken in his argument that there was no showing of titles being removed based on a comparison step.   Like the Board, the Solicitor's Brief (p. 14) artificially and self-servingly highlights limited excerpts of the Examiner's Answer to extract another interpretation that is simply contradicted by the larger record.

The Solicitor's Brief (p. 14) also hangs its hat on the fact that the Examiner indicated that he tried to look for the literal words set out in the limitation in the disclosure.  But, again, there they fail to take note that - when viewed in the total context - the object of his search was not the "comparing" operation, but rather the more limited "removal or removed" operation.

To salvage the Board's re-write of the rejection, the Solicitor suggests (SB 15) that since the <u>entire</u> limitation was rejected, the Examiner must have been

complaining about the "comparison" operation as well.  Appellant submits that this

logic is not well founded, since a limitation may contain several parts, and the focus of

the dispute may be on a few words, as in the present instance.  The SB is also on

shaky ground here because the Examiner's articulation at times is vague because he

had a tendency to try and simplify and lump limitations together.  For example, he

wrote that the specification fails to disclose "*an item is actually removed from the queue based*

*on a comparison step as claimed*."  (A120) In fact, there is <u>no</u> specific limitation phrased

this way in the claim; he was instead *conflating* the language in limitations (d) and (e):

> (d) ….further wherein at least for step (d)(2) **said monitoring compares content of playable media items** previously selected by the subscriber with content of playable media items in said subscriber rental queue, including said second proposed playable media item, **to determine if said second proposed playable media item should be removed**;

> (e)     **modifying said subscriber rental queue with the computing system** based on an authorization from the subscriber to generate a new ordered list of one or more playable media items in response to the results of steps (c) and (d); **wherein at least some playable media items including said second proposed playable media item can be automatically removed by the computing system for the subscriber from said subscriber rental queue in response to said authorization**.  [A162-163]

As seen above, limitation (d) doesn't actually cause or result in an item being

"actually" removed; it merely determines "if" should occur. The actual removal, if

any, doesn't happen until limitation (e).

In sum, the Examiner's jumbled simplification of the claim language does not

stand for the grander proposition that the Solicitor suggests, namely, that he was

objecting to its <u>entire contents</u>.  On every occasion in which he elaborated his

6

position, or could have contradicted Appellant's formulation, his thesis was emphatic and unequivocal: he did not believe the disclosure showed titles <u>removed</u> from the queue, which in fact was more of an argument directed to limitation (e) and not limitation (d). The SB therefore falls short in its attempt to support the Board's re-write of the rejection.

## III.  APPELLANT ADDRESSED THE RATIONALE AS PRESENTED BY THE EXAMINER FOR THE WRITTEN DESCRIPTION REJECTION BUT WAS IGNORED BY THE BOARD

The Solicitor suggests (SB 17) that Appellants only advanced certain arguments directed to the "removal" position taken by the Examiner. While the above illustrates that Appellant could have reasonably constrained themselves to such arguments based on the Examiner's response articulation of the issues, they nonetheless went far beyond that.

Like the Board the Solicitor acknowledges that Appellant *did* cite additional support for the claimed limitation, including in the Appeal Brief (A162). Like the Board, the Solicitor now attempts (SB 18) however to justify that *some* sections of Appellant's Brief could be ignored under the Rules. None of the authorities it cites however supports the notion that only content within the artificial boundaries labeled "Argument" in the Brief must be considered.

Charitably the Solicitor suggests (SB 18) that "…*the Board considers arguments regardless of its location in the brief…*" but forgets that while such may occur in normal

7

circumstances the panel categorically acknowledged on the record that it was refusing to consider this material in the present instance:

>…The **Appellant is correct** that **the Appeal Brief provided a summary of the claimed subject matter which indicated that the claim limitation at issue was described** at p. 12, ll. 12-20. Req. 3 (citing App. Br. 4) **But this disclosure was not included or mentioned in any part of any argument** challenging the Examiner's position.  [A029] (emphasis added)

>….The argument now being advanced was not before the Board and because **it was not before the Board**, the Board could not have overlooked it in reaching its Decision."  [A032] (emphasis added)

Appellants submit that no amount of linguistic finesse can change the record here: the Board simply *refused* to consider the disclosure sections cited by Appellant in support of the claims, which included substantial portions of the specification including FIG. 4; steps 410 – 495, and discussion at page 18, l. 27 – page 21, l. 22; box 250; page 12, ll. 15 – 20; page 14, l. 29 – page 15, l. 10; FIG. 9 and the discussion at page 31, l. 16 –  page 34, l. 24, and particularly page 12, ll. 12-20 (A162).  All of these sections, discussed below, were not considered, thus rendering any indefensible any notion that they evaluated "all of the evidence" on point.

Appellant further disagrees with the Solicitor (SB 18-19) that the disclosure citations to support the claims from the "Summary" section were not "associated" in the "Argument" section.   First, Appellants submit that the Summary is clearly part of the Brief, and thus inherently "associated" with the arguments.  In addition the Appeal Brief also makes specific note that:

"….Applicant submits that the Examiner **is using definitions of terms that are narrow**, and certainly not constrained in the manner he proposes within the four corners of the disclosure. **There is ample disclosure** for explaining that the claimed invention includes functionality for automatically adding **and removing titles from subscriber queues based on automatic selections of desirable media items**." (A169) (emphasis added)

Appellant submits that it would be reasonably clear to any reader that the "ample disclosure" referred to in the Argument (A169) included those sections identified specifically earlier in the Summary section pertaining as well to how the "automatic selections" were made (A165-A166). In fact the Examiner apparently understood it this way as well, and made <u>particular</u> note that he had <u>reviewed</u> these sections of Appellant's Brief (see A190) identifying support for the claims, another critical issue that the Board also ignored entirely.

Finally, as Appellants noted before, the rejection at hand was based on the adequacy of the <u>disclosure</u>. It would seem reasonable, if not necessary, that those particular sections of an Appeal Brief that are required by the PTAB to focus on such specific topic – i.e., the "Summary of Claimed Subject Matter" surely must be considered as well by such agency.

## IV.    THE APPELLANT'S CITED MATERIALS SUPPORT THE CLAIMED LIMITATIONS

The Solicitor's Brief (SB 19 – 20) tries to re-argue the now very moot point about whether the disclosure actually discloses "removing" titles from the subscriber queue. To this end, it engages in lengthy debate trying to constrain broad terms such

9

as "bump," "replace," etc. to artificially mean something much narrower.  This exercise is odd as apparently the Solicitor does not remember that the Board already determined this issue - whether titles were actually removed - in Appellant's favor:

> "…the Examiner **could not have taken that position** because the automatic removal of a title from a subscriber rental queue was originally claimed."  See 8/19/2013 PTAB Decision page 9. [A010] (emphasis added)

As part of this discussion the Solicitor's brief then tries to adopt the Examiner's (incorrect) conclusion about the disclosure, including the FIG. 9 embodiment as well, arguing that "…the embodiment is 'not actually removing any media titles from any queue.'"  Appellant submits that the Solicitor has not checked this embodiment very well, or considered that the disclosure specifically states that after an exchange is made in the FIG. 9 embodiment "…**the swap is consummated, and the system would then update the respective queues of the two subscribers**."  (A069; ll. 10-13) (emphasis added).  With all due respect, if a title was not being removed/added, there would be no need for the system to "update" the respective queues.  The Solicitor tries too hard to find and impose artificial restrictions that simply do not exist.

To conclude this point, Appellant reiterates examples of the terms used in the disclosure, with respect to adding and removing media titles:

> **"Bump"** (A169) "…, in response to a Queue Management Option #1, a subscriber can elect to have any new automatically selected title "**bump**" the next to be shipped item in the Subscriber Selection Queue 110" (A051-052)

> "**Replace** the next item to be shipped" (box 250) (A081)

"**Swapping**" (FIG. 9; (A069; ll. 7-13; A070-071): "… If the second subscriber accepts the inducement, the access rankings for **the titles are swapped, and their queues are updated**, as seen in step 945)

"**Removed**" – original claim 1; "…automatically selecting a proposed playable media item to be added to the subscriber rental queue, **or removed from the subscriber rental queue;**" (A075);

Appellants also pointed out that the disclosure clearly teaches that titles were removed because subscribers could trade access rights to them, just as fliers "give up" their seats in response to airline inducements for overbooked flights.  (A069; ll. 24-26)

Under the circumstances Appellant submits that the disclosure had ample examples of titles being "removed" in fact from a subscriber queue.  Particularly when viewed in conjunction with the original claim language ("…automatically selecting a proposed playable media item to be … removed from the subscriber rental queue") a skilled artisan would have understood that such related terms (bump, replace, swap) used in the disclosure were also directed to and consistent with encompassing such "removing" operation. The disclosure further notes that such removing is done expressly as a result of "monitoring" operations, which, as noted in the disclosure (and discussed below) specifically include "comparison" operations.

## V.    THE CITATIONS AND ARGUMENTS SUBMITTED AT PP. 25-29 OF THE APPELLANT'S OPENING BRIEF WERE NOT WAIVED

Appellant respectfully disagrees with the Solicitor's contention (SB 23-24) that certain arguments presented in the present appeal were waived.  There are six (6) separate points here raised by the Solicitor which are addressed at length below.

11

Preliminarily Appellant posits that it cannot be faulted for not presenting arguments on issues that were not actually raised until identified in the PTAB decision. Appellant could not have prognosticated that the Board would ignore the rejection as presented, and re-write the rejection into something entirely different. Procedurally Appellants did not have an opportunity to fully address the rejection until now.

Put more bluntly, the unmistakable reality of the record is that the Examiner repeatedly and consistently confirmed the essence of the rejection in his Answer (A192-192; A206-210) precisely as formulated by Appellant in the Appeal Brief. (A168) If any waiver is to attach, it should be to the detriment of the agency in attempting to propose another rationale for the underlying rejection.

Nonetheless addressing each of the Solicitor's items presented on pages 23-24, Appellant responds as following:

1) "bumping" – (AOB at 25) Appellant submits that there was extensive argument presented to the Board on the fact that the Examiner was misconstruing a term that would have been interpreted more broadly by a skilled artisan; see Appeal Brief, pp. 10-11; (A168-169); and Reply Brief, pp. 2-3 (A220-A221) citing online dictionary definition which included a meaning of "remove" for such term;

2) Improper isolation of "removing" based on "comparison" – (AOB at 26) Appellant submits that this issue is not an Examiner error, but a legal error

12

made by the Board in ignoring a requirement to review the claim as a whole,
so it is properly reviewable here.  The Examiner did not isolate and
specifically object to the "comparison" language – this was an invention of
the Board.  Consequently Appellant's argument, presented again this error
by the PTAB, is properly presented and reviewable at this time to explain
the deficiency in the reasoning.  In addition, the Appellant had pointed out
in the Appeal Brief as well (A169) that there is "…is ample disclosure for
explaining that the claimed invention includes functionality for
automatically adding and removing titles from subscriber queues based on
automatic selections of desirable media items."  The "automated selection"
referred to here directly implicates the other claim language, including
limitation (b) (monitoring rules), limitation (c) (monitoring to determine
changes), limitation (d) (automatically selecting) and so on. The support for
those limitations in turn – including boxes 240, 250, etc. - was again directly
identified and made available in the Appeal Brief in the Summary of
Claimed Subject Matter. (A162-A163)

3) <u>PTO ignoring specification evidence describing comparison operations</u>:
(AOB at 27): as above Appellant is addressing a new error made by the
PTAB, not the Examiner, based on the former's re-write of the original
rejection to be based on the "comparison" step, not the removal step.
Nonetheless as explained immediately above, the Examiner and the Board

were aware of the support presented for the autorecommendation logic and related steps.

4) "Main Change to Claim 1: (AOB at 29): as above; the PTAB changed the rationale for the rejection, and hence Appellant was entitled to address the error in their analysis and methodology.  Nonetheless Appellant had already pointed out before in the underlying appeal (A162) the relevance of box 240 and the comparison operation to prior user items;

5) Autorecommender logic including comparing operations: (AOB at 29). Again the Examiner never challenged the "compare" language, despite being presented directly with Appellant's formulation of the rejection. Support for the operation of the autorecommend logic – and attendant comparison aspects - was again expressly provided in the Appeal Brief even though it had not been challenged. (A162)

6) Figs. 2 and 4 supporting written description: (Br. at 29) As above the Examiner never challenged the "compare" language; to the extent the PTAB elected to introduce a new rejection, it should have considered the claim as a whole, including those other portions of the claim that related to the "comparison" operation, including the limitations noted above (b, c, d) and the cited support.

Appellant submits that these arguments were not "waived" because they are presented against the Board's *new* formulation of the rejection, which contradicted the

14

Examiner's Answer, and could not have been reasonably raised before. Be that as it may, to the extent the Court believes the PTAB's formulation was correct, the latter was not empowered to simply ignore the support given for those aspects of the disclosure that bore on the new issue they deemed at stake.

## VI.  THE NEWLY PROPOSED §101 REJECTION IS PROCEDURALLY AND SUBSTANTIVELY DEFICIENT

The Solicitor's Office also proposes that this Court should entertain a new rejection under §101 as well at this stage of the proceedings, based on the recent ruling in  Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 134 S. Ct. 2347 (2014).   Appellant submits that this suggestion is inappropriate given the lack of any briefing or record on the issue, but nonetheless out of respect for judicial economy provides a response below to this proposed new challenge.

### A.  The Claimed Invention Does Not Embody "An Idea of Itself"

As an initial observation, the Solicitor's Office challenge is plainly superficial and overly simplistic. Proceeding from the two-step "framework" - to determine whether the patent claims abstract ideas or other patent-ineligible concepts - it first argues that:

> "....the claimed method involves monitoring a list of playable media items, like DVDs, in a queue that is maintained by a content provider. Simply monitoring the order of items in a list and making suggestions for the list is an abstract idea. The claimed method amounts to "no more than require[ing] a generic computer to perform generic computer instructions" like the method in Alice Corp., and to nothing more than "method[s] of organizing human activity" like the method in Bilski v. Kappos"  (SB 27-28)

15

This oversimplified version of the claims of course is completely inaccurate, as the Solicitor has merely excerpted a small portion of the claim, and omits almost all the steps in the claimed method including the operations of setting up (step a) a subscriber queue (an electronic structure extant on the computing system); monitoring this structure (step c) in accordance with control rules (set up at step b). Based on this automated monitoring the computing system performs additional steps of selecting content to be added or removed to the subscriber's queue (step d), and then modifying the account as needed based on feedback from the user (step e).

The <u>Alice</u> opinion, albeit lacking guidance in many regards as many Courts have acknowledged, simply does not define "abstract idea" with the same broad brush suggested by the Solicitor here. Indeed the main tenet it articulates is:

> ... The "abstract ideas" categories embodies "the long standing rule that '**[a]n idea of itself is not patentable**." <u>Id</u>. (emphasis added)

The <u>Alice</u> Court only narrowly found that that an "intermediated settlement" was an example of an abstract idea, analogizing it to the economic "hedging" concept found unpatentable in <u>Bilski v. Kappos</u>, 561 U.S. 593, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010); <u>Alice</u> at 2356. The majority opinion drew no bright line and made no other sweeping statement, pronouncement, definition or expansion of what other types of claims would fall under the ambit of an "abstract idea."

Unlike the <u>Alice</u> claim (reproduced in the footnote below[1]) the claim at issue here recites specific, tangible, physical operations involving a computing system, and hardly embodies only "an idea of itself" such as a patent on a mere formula (<u>Parker v. Flook</u>, 437 U.S. 584, 594-595, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978)), or on some fundamental economic practice.

Finally the Solicitor does not explain how the present claim remotely embodies a "...method of organizing human activity" as asserted.[2]  Any "human activity" aspects

---

[1] Claim 33 of the patent at issue there recited:

*A method of exchanging obligations as between parties, each party holding a credit record and a debit record with an exchange institution, the credit records and debit records for exchange of predetermined obligations, the method comprising the steps of:*

*(a) creating a shadow credit record and a shadow debit record for each stakeholder party to be held independently by a supervisory institution from the exchange institutions;*

*(b) obtaining from each exchange institution a start-of-day balance for each shadow credit record and shadow debit record;*

*(c) for every transaction resulting in an exchange obligation, the supervisory institution adjusting each respective party's shadow credit record or shadow debit record, allowing only these transactions that do not result in the value of the shadow debit record being less than the value of the shadow credit record at any time, each said adjustment taking place in chronological order, and*

*(d) at the end-of-day, the supervisory institution instructing on[e] of the exchange institutions to exchange credits or debits to the credit record and debit record of the respective parties in accordance with the adjustments of the said permitted transactions, the credits and debits being irrevocable, time invariant obligations placed on the exchange institutions.*

Appellant submits that unlike the present claims, there is no hint of computers, software or any other meaningful structure in the <u>Alice</u> claim that integrates or tethers the abstract idea to anything "technological."

[2] From a precedential standpoint the Solicitor also fails to note that the blanket, bright line test rejecting all so-called "business methods" patents was not in fact adopted by the majority in <u>Alice</u>.  Thus even if it applied here (which it does not) this would not be dispositive under §101.

17

of the claim - to the extent such can be said to exist - are completely secondary to providing inputs to the main automated agent features.

B.    The Claimed Invention Improves Existing Technological Processes, Thereby Removing It From The Realm of Ineligible Subject Matter

The Solicitor's office also fails to take note that the Alice opinion expressly noted that historically claims that "...improved an existing technological process" do not fall into the definition of "abstract ideas," citing Diamond v. Diehr, 450 U.S. 175, 187, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981); Alice at 2358.   Here, as in Diehr, there is a clearly discernible "technological process" associated with the present claims as is apparent from reading the disclosure.

The invention(s) make note that prior art computing systems at online websites which identified, managed and distributed digital content (which Appellants submit is plainly a "technological" process under any conventional definition) failed to satisfy some customers because, among other things, these systems did not proactively monitor and manage subscriber accounts, keep them apprised of modifications that could be made to such accounts, and so on.  This leads to problems such as, among other things, subscriber churn (A039-A040).

The claimed inventions in fact "improve" these existing computing systems by implementing new "technical" operational steps to address these deficiencies.  These can be grouped into at least four different categories/types.  For example, the fact that the inventive computing system works as an automated agent on behalf of

18

subscribers - even when they are not online – results in better inventory management (Type 1) (because it can allocate items even without customer intervention), less customer bandwidth usage (Type 2) (because customers don't need to be connected to a port over a network), enhanced engagement/reach of the recommender system (Type 3) (because more contacts are made through other mechanisms, including email) more efficient use of resources (Type 4) (because recommendations can be performed prior to engagement) and so on, all of which are well understood as "technological" processes.

To illustrate this point, Appellant provides an annotated version of FIG. 7 of the disclosure (A088), which identifies some of the technological areas addressed and improved by the claims. To wit, "new" modules incorporated within the computing system are identified with a dashed circle; "modified" modules with a dashed rectangle; network connections 702 and 705 show interactions with other client computing systems, databases, etc., to manage inventory, deliveries/shipping, etc.:



Support for these distinct types of technological improvements is identified in the disclosure, including in several detailed discussions:

- embodiments reduce processing and shipping time for inventories associated with prior art (A039 - 2:8-11) (TYPE 1)

- embodiments improve existing recommender that only give suggestions "...to users while they are online during a particular session" and do not "…perform any active monitoring of their selections after such time to see if a new

selection is now available that may be desirable for consideration in (or automatic insertion into) their rental selection queue." (A040) (TYPE 2)

- embodiments include features whereby "....subscribers/purchasers can enjoy the benefits of such system even during periods when they are not actively engaged with an online rental/purchase system;" (A041 - 4:13-16) (TYPE 3/4)

- some embodiments automatically ensure that subscribers preference queue is never allowed to completely run "dry" so to speak. (A045 - 8:3-8) (TYPE 2/3)

- embodiments help manage inventory and in spreading out/satisfying demand for media inventory, particularly popular titles (A048 - 11:10-15) (TYPE 1)

- embodiments reduce wasted shipments, user wasted time, etc. (A049 - 12:5-9) (TYPE 1)

- users are not required to physically log on to the site, look for, review or study the particular selection in many embodiments. Instead, the system automatically determines this for the subscriber, and adds the same to his/her Subscriber Selection Queue 110. (A049 - 12:23-26) (TYPE 2/3)

- recommender works in the background, seamlessly and without extensive burdensome participation by the subscriber so that the queue is automatically replenished. (A051 - 14:20-22) (TYPE 4)

- embodiments give more flexibility in responding to demand.... a service provider can determine which titles have a higher profit margin (i.e., lower

sharing expenses with distributors, studios, etc.) and control the distribution of titles more closely using cost/profit as an additional factor as well. (A055 - 18:3-8) (TYPE 1)

- "...monitoring logic of the present invention can operate to spread out demand for popular titles, while achieving a greater degree of customer satisfaction, and increasing reach of the service provider to other audiences." (A055 - 18:23-26) (TYPE 1)

- Embodiments enhance the value of recommender systems, in fact, by "more proactively "pushing" valuable, interesting and high profit margin titles to subscribers in an optimal location along the distribution chain." (A056 - 19:13-19) (TYPE 2, 4)

- Some embodiments predict success/capacity requirements of future titles that may be included in inventory to reduce demand uncertainty. (A067 - 30:13-19) (TYPE 1)

- "...system can do a primitive form of "capacity" planning by determining demand and allocating the resource (a title) in a more efficient matter so that it can be enjoyed by the greatest number of subscribers." (A069 - 32:18-21) (TYPE 1)

- System preempts and reduces customer defections by preventing stock-out. (A070 - 33:1-5) (TYPE 1, 3)

22

Appellant submits that the "technological" improvements effectuated by the claimed invention are highlighted and documented extensively throughout the disclosure, and place it squarely within the realm of subject matter long established as patent eligible.   None of the modules identified in rounded dashed circles are "generic" or implemented in computing systems prior to the current teachings.  Even the specific form of "recommender" subsystem 725 of the present invention (shown with a dashed rectangular box) includes aspects that are not shown or taught in the prior art, including as claim 1 recites, providing suggestions based on comparing content of playable media items previously selected by the subscriber with content of playable media items currently in the subscriber rental queue.

C.      The Claimed Invention Further Satisfies the Second Step of Alice

The second step of the Alice Corp. test need only be addressed if it is first determined that the claims are drawn an abstract idea. Appellant submits that the claims do not fall within such characterization for the reasons above.  In addition, Appellant submits that the detailed discussion above of the claim limitations illustrates vividly that they individually - and as an ordered combination -  "transform the nature of the claim into a patent-eligible application." Alice Corp., at 2355.   The claims go far beyond an "abstract idea" and recite several steps beyond simply "monitoring the order of items on a list" and making suggestions for such list.

The Solicitor's main contention here (SB 29) seems to be that since the disclosure indicates that *some* generic computer related components (hardware and software) may be modified and used with the claimed embodiments, this somehow renders the entire claim now as patent ineligible.  As first point, however, Appellant disputes that the disclosure only describes "generic" computers, because (in the line immediately following the citation given by the Solicitor) it expressly articulates that:

> These software components are essentially the same as those found in a prior art system, except they may be modified appropriately to cooperate **with the new software components of the present invention**, including an Intelligent Queue Monitor module 726, a Subscriber Queue Control Module 727, a Queue Status Notification Module 728 and a Feedback System 729. (A060-061) (emphasis added)

> Exchange modules 730 and 731 are also identified as unique to the present

disclosure.  (A064; ll. 22-32) (A068; ll. 1-15)  Accordingly Appellant does not agree that the computing systems of the claimed invention are generic, because they are expressly described as including certain key software components (integrated within such systems) unique to the disclosure. [3]

---

[3] Appellant submits that the SB implication of what is a "generic computer" is fraught with danger if again the definition is applied too strictly to mean any machines that merely share certain hardware or software components.  For example, a cellphone can be considered a form of computer, as can a calculator, a laptop, and even some new watches.   While these machines include some common functions and hardware components, the different novel functions they perform as tools in the electronic domain (achieved in large part by integrated software components) makes them as different from one another as a hammer is from a saw in the mechanical realm (even if the latter tools both share a "handle" component).

Furthermore, with all due respect, the Solicitor again misapplies the <u>Alice</u> test in backwards fashion. The <u>Alice</u> Court merely noted that implementing an otherwise ineligible abstract idea on a generic computer did not magically cure any "abstractness" deficiency. Nowhere does it say the converse however: i.e., that an otherwise novel and eligible invention was disqualified *simply because* it could be implemented on a generic computer. In fact, the <u>Alice</u> opinion warns explicitly against such coarse treatment, because such sweeping approach would "swallow" all of patent law under § 101:

> At the same time, we tread carefully in construing this exclusionary principle lest it swallow all of patent law. <u>Mayo</u>, 566 U. S., at ___ (slip op., at 2). At some level, "all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." <u>Alice</u> at 2354.

Appellant submits that the indiscriminate approach suggested here by the Solicitor violates the narrow tenet that is attendant to a §101 analysis. Taken to its natural conclusion, the Solicitor's test would "swallow" - among other important ongoing innovations - "new" uses for "generic" drugs, "new" uses for existing "generic" manufacturing reactors, and so on to name a few. This is contrary to the plain definitions and boundaries provided directly in the statute.

As an example, the patent law has long recognized that a patent may extend to a discovery of a new treatment or use of an "old" drug composition, or even a new use of a known machine: <u>see</u> 35 U.S.C. §100:

When used in this title unless the context otherwise indicates –

…(b) The term "process" means process, art, or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material.

Thus the "genericness" of a drug article or a composition (i.e., that it is "known") does not disqualify a novel use (a new treatment for example) of the same as patent ineligible.

Similarly in the semiconductor arts, a "generic" plasma reactor ("machine") for example may be capable of performing almost an infinite number of process permutations through adjustments in time, temperature, pressure, gas composition/mixtures, and so on for new uses.  A new manufacturing recipe (articulated as a set of process steps) for making a semiconductor chip wafer can be a "new use" of such machine and not precluded as patent ineligible under §101 simply because the reactor is old or "generic."

Appellant submits that with a more developed record, this list could be expanded if necessary to illustrate further the absurdity of this indiscriminate approach.  For the reasons set forth above Appellant submits that the proposed §101 rejection is not supportable against the present claims.

# VII.   CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Based on the arguments and conclusions presented here and in the AOB, Appellant respectfully requests reversal of the Board's decision which sustains a written description rejection of claims 1-30.

Respectfully submitted,

J. Nicholas Gross

November 17, 2014

Law Office of J. Nicholas Gross, P.C.
PO Box 9489
Berkeley, CA 94709
510-540-6300
510-540-6315 (fax)

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

**Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    [x ]    this brief contains <u>6175</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

    [ ]    this brief uses a monospaced typeface and contains <state the number of> lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [x ]    this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word in Garamond font size 14</u> *or*

    [ ]    this brief has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date: November 17 2014

                        J. Nicholas Gross
                        Attorney for Appellant
                        Law Office of J. Nicholas Gross, P.C.
                        PO Box 9489
                        Berkeley, CA 94709
                        510-540-6300
                        510-540-6315 (fax)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

IN RE JOHN NICHOLAS GROSS     )   Appeal No. 14 - 1474
                                     )
                                     )   Serial No. 10/770,767

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2014 I electronically filed the CORRECTED BRIEF FOR APPELLANT with the Court's CM/ECF filing system. Counsel for PTO Solicitor's Office was electronically served via e-mail through the Court's CM/ECF system per Fed. R. App. P. 25 and Fed. Cir. R. 25.

*/s/ J. Nicholas Gross*

J. Nicholas Gross
Law Office of Nicholas Gross, Professional Corp.
P.O. Box 9489
Berkley, CA 94709